DAVID MARA, Cal. Bar No. 230498
dmara@maralawfirm.com
JILL VECCHI, Cal. Bar No. 299333
jvecchi@maralawfirm.com
**MARA LAW FIRM, PC**
2650 Camino Del Rio North, Suite 205
San Diego, CA 92108
Telephone:   +1 619 234 2833
Facsimile:    +1 619 234 4048

Attorneys for Plaintiff TERRANCE BAILEY

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRANCE BAILEY, on behalf of himself, all others similarly situated, and on behalf of the general public,<br><br>       Plaintiff,<br><br>  v.<br><br>BLUE APRON, LLC; BLUE APRON, INC.; and DOES 1-100,<br><br>       Defendant. | CASE NO. 3:18-cv-07000-VC<br><br>[Assigned to the Honorable Vince Chhabria]<br><br>**PLAINTIFF TERRANCE BAILEY'S NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date: November 19, 2020<br>Time: 10:00 a.m.<br>Courtroom: 4<br><br>State Action Filed:   October 5, 2018<br>FAC Filed:              August 22, 2019<br>Removal:                November 9, 2018<br>Trial Date:             None |

**TO: ALL PARTIES HEREIN AND TO THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that Plaintiff Terrance Bailey moves this Court for an order: (1) confirming certification of the Class for settlement  purposes only; (2) finally approving the settlement embodied in the Joint Stipulation and Settlement Agreement; (3) confirming Phoenix Settlement Administrators as the Settlement Administrator and granting the requested fee for its services as Settlement Administrator; (4) finally approving the Private Attorneys General Act of 2004 Payment; and (5) entering judgment.

This motion is set for determination on November 19, 2020, at 10:00 a.m. in Courtroom No. 4 (17th Floor) in the above entitled courthouse located at 450 Golden Gate Avenue, San Francisco, California 94102. This motion is based upon this notice, the accompanying Memorandum of Points & Authorities filed herewith, the accompanying Declaration of David Mara filed herewith, the Joint Stipulation and Settlement Agreement and all exhibits thereto, the Order Granting Preliminary Approval, the filings on record in this case, and upon such further evidence, both documentary and oral, that may be presented at the hearing of this motion.


Dated: October 15, 2020                     **MARA LAW FIRM, PC**

                                            By:/s/ *David Mara*_____
                                                 David Mara, Esq.
                                                 Jill Vecchi, Esq.
                                                 Attorneys for Plaintiff

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................. 1

II.   FACTUAL AND PROCEDURAL BACKGROUND ........................................... 1

    a.    Plaintiff Filed His Motion for Class Certification .................................... 2

    b.    Settlement Negotiations ............................................................................. 3

III.  SUMMARY OF SETTLEMENT ..................................................................... 3

    a.    The Proposed Class ................................................................................... 3

    b.    The Gross Settlement Amount .................................................................. 3

    c.    Settlement Payments to Class Members .................................................... 4

    d.    Institutional Changes ................................................................................. 5

    e.    Funding and Distribution of Settlement Funds .......................................... 6

    f.    Uncashed Checks and Cy Pres Beneficiary ............................................... 6

    g.    Released Claims ......................................................................................... 7

IV.   THE SETTLEMENT NOTICE PROCESS WAS SUCCESSFUL .................... 7

    a.    Dissemination of the Class Notice ............................................................ 7

    b.    No Objections or Requests for Exclusion Were Received by Phoenix ....... 8

V.    DISCUSSION ................................................................................................. 9

    a.    The Settlement Meets the Standards Governing Final Approval ................ 9

        i.    The Settlement was a Result of Arm's-Length Negotiations ............ 9

        ii.   *In re Bluetooth* Factors are not Present Here .............................. 10

        iii.  The Settlement is Fair .................................................................. 11

            1.    All of Plaintiff's Claims Revolve Around Blue Apron's Security Procedure ................................................................. 11

            2.    Risks of Certification .............................................................. 12

            3.    Risks on the Merits ................................................................. 14

            a.    Unpaid Wage Claims ............................................................. 14

            b.    Meal and Rest Period Claims ................................................. 17

            c.    Wage Statement and Waiting Time Penalties Claims .............. 18

|   |   |   | d. | PAGA Claims ........................................................................ | 19 |
|   |   |   | 4. | Risks of Further Litigation ................................................ | 19 |
|   | b. | Sufficient Discovery and Investigation Has Occurred ............................ | 21 |
|   | c. | Class Counsel Have Extensive Experience Acting as Class Counsel ...................... | 21 |
|   | d. | The Class Members' Response to the Settlement is Further Evidence That the Settlement is Fair and Reasonable ........................ | 22 |
|   | e. | The Court Should Approve the Settlement Administration Fee .......................... | 22 |
|   | f. | The Court Should Approve the PAGA Payment to the LWDA ........................... | 23 |
| VI. | CONCLUSION ...................................................................................... | 23 |

**TABLE OF AUTHORITIES**

**Cases**

*Amaral v. Cintas Corp. No. 2*, 163 Cal.App.4th 1157 (2008)......................................18

*Bono Enterprises, Inc. v. Bradshaw*, 32 Cal. App. 4th 968 (1995) ...............................15

*Boyd v. Bechtel Corp.*, 485 F. Supp. 610 (N.D. Cal. 1979) .........................................10

*Cervantez v. Celestica Corp.*, 253 F.R.D. 562 (E.D. Cal. July 30, 2008).......................13

*Class Plaintiffs v. Seattle*, 955 F.2d 1268 (9th Cir. 1992)............................................ 9

*Frlekin v. Apple, Inc.*, 2020 Cal. LEXIS 547 *1 (2020) ................................. 12, 15, 16

*H&R Block Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005).......................10

*Hamilton v. Wal-Mart Stores, Inc.*, 2018 U.S. Dist. LEXIS 168235 *1 (C.D. Cal. Aug. 21, 2018)

..............................................................................................................13, 14, 18

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)...............................9, 10, 11

*In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935 (9th Cir. 2011) .....................10

*In re Heritage Bond Litigation*, 2005 U.S. Dist. LEXIS 13555 *1 (C.D. Cal. June 10, 2005).......... 9

*Joel A. v. Giuliani*, 218 F.3d 132 (2d Cir. 2000) ......................................................... 9

*Kirkorian v. Borelli*, 695 F. Supp. 446 (N.D. Cal. 1988).............................................10

*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234 (9th Cir. 1998) ...................................11

*Mandujano v. Basic Vegetable Products, Inc.*, 541 F. 2d 832 (9th Cir. 1976).................................22

*Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173 (9th Cir. 1977)....................................11

*Mendiola v. CPS Security Solutions, Inc.*, 60 Cal. 4th 833 (2015)..................................15

*Morillion v. Royal Packing Co.*, 22 Cal. 4th 575 (2000) .......................................13, 15

*Officers for Justice v. Civil Service Comm. of City and County of San Francisco*, 688 F. 2d 615 (9th

Cir. 1982)......................................................................................................11

*Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009)................................10

*Thurman v. Bayshore Transit Management, Inc.*, 203 Cal. App. 4th 1112 (2012) ..........................19

*Troester v. Starbucks Corp.*, 5 Cal. 5th 829 (2018)......................................................15

*Van Ba Ma v. Covidien Holding, Inc.*, 2014 U.S. Dist. LEXIS 76359 *1 (C.D. Cal. 2014) ...........11

**TO THE HONORABLE VINCE CHHABRIA, DEFENDANT, AND ALL COUNSEL OF RECORD:**

Plaintiff Terrance Bailey (hereinafter "Plaintiff" or "Mr. Bailey"), a former employee of Defendant Blue Apron, LLC (hereinafter "Blue Apron" or "Defendant")[1] (Plaintiff and Defendant are collectively referred to as the "Parties"), submits this Motion for Final Approval of Class Action Settlement:

## I.    INTRODUCTION

Plaintiff seeks final approval of the Parties' Joint Stipulation and Settlement Agreement ("Joint Stipulation").[2] The proposed settlement is a non-reversionary $2,000,000 class action settlement achieved on behalf of 3,767 Class Members. The proposed Class is defined as "all current and former non-exempt employees who worked for Blue Apron in California at any time during the period from October 5, 2014 through April 16, 2020." The settlement is projected to pay each Participating Class Member an average of approximately $341.92.[3] The highest estimated settlement share is approximately $2,117.12.[4]

In response to the Class Notice, no Class Members objected to the settlement or requested to be excluded from the settlement. Therefore, all 3,767 Class Members are participating in the settlement. The Class Members' response supports the Court's finding that the settlement is fair, reasonable, and adequate. For the reasons that follow, it is respectfully requested the Court grant this motion and find the settlement is fair reasonable and adequate.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Blue Apron is a subscription-based meal provider. Blue Apron operates out of warehouses it calls fulfillment centers, which are located in Linden, New Jersey and Richmond, California.[5] This class settlement involves only the hourly employees who worked at the Richmond, California

---

[1] Blue Apron, Inc. changed its name to Blue Apron, LLC in approximately September 2017.
[2] A true and correct copy of the Joint Stipulation is attached to the Declaration of David Mara, Esq. as **Exhibit 1**.
[3] Declaration of Elizabeth Kruckenberg Regarding Notice and Settlement Administration ("Kruckenberg Decl.") ¶ 13.
[4] Kruckenberg Decl. ¶ 13.
[5] Blue Apron closed its fulfillment center in Arlington, Texas in May of 2019.

fulfillment center. This action was originally filed in the Alameda County Superior Court on October 5, 2018. Blue Apron removed this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), on November 19, 2018. (*See* ECF Dkt. No. 1). Thereafter, on August 22, 2019, Plaintiff filed a First Amended Complaint. (*See* ECF Dkt. No. 24). Plaintiff's First Amended Complaint alleges causes of action for Blue Apron's failure to pay all straight time wages, failure to pay all overtime wages, failure to provide meal periods, failure to authorize and permit rest periods, knowing and intentional failure to comply with itemized employee wage statement provisions, failure to pay all wages due at the termination of employment, and violation of Unfair Competition Law. (*See* ECF Dkt. No. 24).

In addition to this wage and hour class action, Plaintiff is also the named plaintiff in an action alleging violations of the Private Attorneys General Act of 2004 ("PAGA") pending against Blue Apron in the Alameda County Superior Court (Case No. RG17878905). This action was filed on October 16, 2017 and alleges violations of the PAGA for Blue Apron's failure to pay all wages owed, failure to pay all overtime wages, failure to provide meal periods, failure to provide rest periods, failure to pay wages due at the termination of employment, failure to comply with itemized employee wage statement provisions, and failure to provide suitable resting facilities. The facts underlying the allegations in the wage and hour class action and the PAGA action are same.

On July 22, 2020, Plaintiff filed a Second Amended Complaint adding in the PAGA claims into his wage and hour class action. (*See* ECF Dkt. No. 43).

### a. Plaintiff Filed His Motion for Class Certification

The proposed settlement was reached after considerable discovery and investigation. This discovery included written discovery and the depositions. Plaintiff took the depositions of two of Blue Apron's representatives and Blue Apron took Plaintiff's deposition. The discovery in this case lead to the analysis of thousands of pages of documents. Blue Apron also produced surveillance videos showing the security area and exit of its fulfillment center. Plaintiff hired an expert, Mr. Brian Kriegler, who analyzed the timekeeping and payroll data and surveillance videos produced. (Mara Decl. ¶¶ 12-13). This discovery culminated in Plaintiff filing his motion for class certification on December 16, 2019. (*See* ECF Dkt. No. 29).

/ / /

### b. Settlement Negotiations

During the course of litigation, Counsel for the Parties agreed to mediate the wage and hour class action and the PAGA action in one global mediation. On November 20, 2019, the Parties attended mediation with David Rotman. While this mediation was unsuccessful, the Parties continued their negotiations informally with the help of the mediator. On or about December 18, 2019, the Parties reached a settlement in principle. (Mara Decl. ¶ 14). The Parties' settlement has been memorialized in a long form settlement agreement. The Parties now seek the Court's final approval of their Joint Stipulation and Settlement Agreement, which is attached to the Declaration of David Mara, Esq., in Support of Plaintiff's Motion for Preliminary Approval of Class Action Settlement as Exhibit 1.

## III. SUMMARY OF SETTLEMENT

The principle terms of the Joint Stipulation are as follows:

### a. The Proposed Class

The Joint Stipulation proposes a Class comprised of: "All current and former non-exempt employees who worked for Defendant in California at any time during the period from October 5, 2014 through April 16, 2020." (Mara Decl., Exhibit 1 at ¶ 4). There are 3,767 individuals who fall within this Class definition.

### b. The Gross Settlement Amount

Under the Joint Stipulation, Blue Apron shall pay $2,000,000 (referred to as the "Gross Settlement Amount" or "GSA") to fully and finally settle this matter. This is the total amount Blue Apron is required to pay under the Joint Stipulation, except for the employer's share of payroll taxes. The employer's share of payroll taxes will remain Blue Apron's exclusive responsibility and will be paid by Blue Apron separate from and in addition to the GSA. ***No portion of the GSA will revert to Blue Apron for any reason.*** Subject to the Court's final approval, the following deductions will be made from the GSA: (1) $10,000 to Plaintiff/Class Representative Terrance Bailey, to compensate him for his time, effort and risks he undertook in filing this lawsuit; (2) $500,000 (25% of the GSA) to Class Counsel for attorneys' fees to compensate them for their work on the lawsuit, as well as any work remaining in securing Court approval of the settlement, administration of the settlement, and

obtaining dismissal of the lawsuit; (3) $68,354.51 (previously estimated not to exceed $90,000) to Class Counsel for reimbursement of their litigation costs; (4) $22,500 (previously estimated not to exceed $30,000) to Phoenix Settlement Administrators ("Phoenix") for its work performed and to be performed in administering the settlement; and (5) $112,500 to the California Labor and Workforce Development Agency ("LWDA") for its 75% share of the $150,000 PAGA Payment.

### c. Settlement Payments to Class Members

After all deductions have been made, it is estimated that $1,286,645.49 ("Net Settlement Amount" or "NSA") will be available for disbursement to Participating Class Members, resulting in an average payment of $341.92[6] per Participating Class Member. Per the Joint Stipulation, "Participating Class Members" are defined as all Class Members who do not submit a valid and timely request to exclude themselves from the settlement. The money available for payout to these individuals comes out of the NSA, which is what remains of the GSA after subtracting all Court approved attorneys' fees and costs, the Class Representative Enhancement Payment, settlement administration costs, and the LWDA's portion of the PAGA Payment.

Each Individual Settlement Share will be calculated as follows:

> Each Participating Class Member will receive a proportionate share of the Net Settlement Amount that is equal to (i) the number of weeks he or she worked for Defendant in California, in an hourly, non-exempt position, based on the Class Data provided by Defendant, divided by (ii) the total number of weeks worked by all Participating Class Members based on the same Class Data, which is then multiplied by the Net Settlement Amount. One day worked in a given week will be credited as a work week for purposes of this calculation. Therefore, the value of each Class Member's Individual Settlement Share ties directly to the amount of weeks that he or she worked.

(Mara Decl., Exhibit 1 at ¶ 65(A)). Accordingly, each Class Member's settlement share ties directly to the amount of weeks they worked for Blue Apron.

Fifty percent (50%) of each Individual Settlement Share is intended to settle claims for unpaid wages and will be reported on an IRS Form W2, subject to all tax withholdings customarily withheld from an employee's wages. The remainder will be allocated to penalties and interest and is intended

---

[6] Kruckenberg Decl. ¶ 13.

1  to settle the non-wage claims for interest and penalties and will be reported on an IRS Form 1099.

2  (Mara Decl., Exhibit 1 at ¶ 65(B)).

3        **d. Institutional Changes**

4        As part of this settlement, Blue Apron has agreed to make institutional changes to policies

5  that were the focal point of the litigation. Blue Apron has agreed to change its meal and rest period

6  policies. Blue Apron will change its rest period policy to state that employees are permitted at least

7  a fifteen (15) minute rest period. (Mara Decl., Exhibit 1 at ¶ 71(A)(i)). The rest period policy will

8  also state that employees are free to leave the premises during rest periods and are free from Blue

9  Apron's control during this time. (*Id.*). In addition, Blue Apron will change its meal period policy to

10  state that employees are permitted at least a thirty-five (35) minute meal period. (Mara Decl., Exhibit

11  1 at ¶ 71(A)(ii)). The meal period policy will also state that employees are free to leave the premises

12  during meal periods and are free from Blue Apron's control during this time. (*Id.*). Allowing

13  employees an extra five minutes per break ensures that employees receive a full ten (10) minute rest

14  period and full thirty (30) minute meal period at a suitable break area. Blue Apron will make these

15  changes within fifteen (15) calendar days of the Effective Final Settlement Date. (Mara Decl., Exhibit

16  1 at ¶ 71(A)).

17        Blue Apron has also agreed to make changes to its Richmond facility in a way that remedies

18  one of the issues raised in this lawsuit. Blue Apron has agreed that it will move its timeclocks from

19  inside the security area to outside the security area. (Mara Decl., Exhibit 1 at ¶ 71(B)). Said

20  differently, employees will now clock in for their shifts prior to passing through Blue Apron's

21  security area. Blue Apron will make this change within thirty (30) calendar days of the Effective

22  Final Settlement Date. (*Id.*).

23        Blue Apron will provide written confirmation to Class Counsel within forty-five (45) calendar

24  days of the Effective Final Settlement Date confirming that the institutional changes were made.

25  (Mara Decl., Exhibit 1 at ¶ 71(C)). Blue Apron will also provide Class Counsel with copies of the

26  new policies that were implemented and how these new policies were communicated to Class

27  Members. (*Id.*). Blue Apron will also inform Class Counsel of the date on which each change was

28  made. (*Id.*).

### e. Funding and Distribution of Settlement Funds

Subject to the Court's final approval, the GSA shall be funded by Blue Apron within ten (10) calendar days of the Effective Final Settlement Date. (Mara Decl., Exhibit 1 at ¶ 68(M)(i)). As no objections have been filed, the Effective Final Settlement Date should be the date on which both of the following events occurs: (1) the Court enters judgment granting final approval of the settlement; and (2) the date the Alameda County Superior Court enters dismissal of the matter in *Terrance Bailey v. Blue Apron, LLC; Blue Apron, Inc.* (Case No. RG17878905). (Mara Decl., Exhibit 1 at ¶ 19). Therefore, assuming the Court approves of the settlement on November 19, 2020 and the dismissal of the Alameda County Superior Court case is entered within ten (10) days of the date this Court grants final approval,[7] the settlement should be funded on or about December 9, 2020 (ten calendar days of the Effective Final Settlement Date) and disbursed on or about December 19, 2020 (ten calendar days after the settlement is funded). (*See* Mara Decl., Exhibit 1 at ¶ 17).

### f. Uncashed Checks and Cy Pres Beneficiary

Pursuant to the Joint Stipulation, any checks issued to Participating Class Members shall remain valid and negotiable for 180 days from the date of issuance. The Parties agreed that the funds from any uncashed checks will be sent to a cy pres beneficiary. (Mara Decl., Exhibit 1 at ¶ 68(O)(ii)). If any checks remain uncashed or not deposited 90-days after the mailing of checks, the Settlement Administrator will mail a reminder notice to these individuals. (*Id.*). Within 200 calendar days of mailing checks to Participating Class Members, the Settlement Administrator will deposit with the Cy Pres Beneficiary any funds that were allocated to Participating Class Members who did not cash their settlement check within 180 days of mailing. (*Id.*).

The Parties chose the United Way of California as the cy pres beneficiary.[8] The United Way of California is an umbrella organization, supporting multiple local United Ways throughout the state that all serve the public by working towards financial stability of the citizens they support. Many of these local United Ways have specific programs aimed at promoting steady, gainful employment of

---

[7] Plaintiff will have a dismissal of the PAGA action prepared and ready to file pending this Court's order granting final approval.

[8] There is no relationship between the proposed cy pres beneficiary and the Parties or their Counsel.

Californians, something that meets the objectives of a lawsuit brought with the aim of enforcing employee rights, and supports silent class members through the variety of programs offered. For example, the United Way Bay Area, the local program covering the location in which Plaintiff worked, has programs such as "SparkPoint", which operates counseling centers throughout the Bay Area that offer job coaching and training, career development, and business development, providing Northern Californians with the skills needed to find and maintain a lifelong career. The United Way Bay Area also offers programs like "Mayors Youth Jobs+", which helps young adults find employment through internships, apprenticeships, trainings and other opportunities to allow future members of the workforce to obtain employment and post-secondary opportunities. Beyond just programs like these that support job seekers and employees in the Bay Area, the United Way also advocates at the policy level for an increase to the State minimum wage.

### g. Released Claims

In exchange for Blue Apron's promise to make the payments and institutional changes provided for in the Joint Stipulation, as of the Effective Final Settlement Date, Participating Class Members shall release "all known and unknown state law claims that were alleged or that could have been alleged based on the facts of the complaints and PAGA letters filed in the matter." (Mara Decl., Exhibit 1 at ¶ 35; *see also* ¶ 69). The release covers facts that were alleged or could have been alleged in Plaintiff's complaints and PAGA letters, as such the release is tied to the facts contained therein. Only Plaintiff has agreed to a general release of all claims, including a waiver under California Civil Code section 1542.

## IV. THE SETTLEMENT NOTICE PROCESS WAS SUCCESSFUL

### a. Dissemination of the Class Notice

The Court granted preliminary approval of the settlement on July 21, 2020. (ECF Dkt. No. 42). At that time, Phoenix was appointed by the Court as the Settlement Administrator. Phoenix has complied with this Court's orders concerning dissemination of the Class Notice. After the Court granted preliminary approval, Blue Apron sent the Class Data[9] to Phoenix. (Kruckenberg Decl. ¶ 3).

---

[9] The "Class Data" is the electronic database Blue Apron delivered to the Settlement Administrator which lists the following information for each Class Member: (1) first and last name; (2) last known

Phoenix conducted a National Change of Address search on the addresses in the Class Data in an attempt to update the addresses as accurately as possible.[10] (Kruckenberg Decl. ¶ 4). The Class Notice was mailed to Class Members on August 18, 2020. (Kruckenberg Decl. ¶ 5). Notice of settlement was also emailed to Class Members who had an email address on file with Blue Apron. (*Id.*).

As of the date of this filing, 189 Class Notices were returned by the U.S. Postal Service as undeliverable, of which two (2) had a forwarding address. (Kruckenberg Decl. ¶ 7). As a result of Phoenix's skip trace efforts on all returned mail, 177 Class Notices were re-mailed. (*Id.*). Ten (10) Class Notices were deemed undeliverable after Phoenix's skip trace efforts. (*Id.*). Phoenix provided Class Counsel with the last known addresses for the ten (10) Class Members with undeliverable Class Notices and Class Counsel had a TLOxp search[11] conducted for these individuals. (*Id.* at ¶ 8). Phoenix then mailed Class Notices to the addresses found as a result of Class Counsel's TLOxp search. (*Id.*). Ultimately, no Class Notices are currently deemed undeliverable. (*Id.* at ¶ 9).

### b. No Objections or Requests for Exclusion Were Received by Phoenix

The deadline to submit an objection to the settlement or a request for exclusion from the settlement was October 2, 2020. (Kruckenberg Decl. ¶¶ 10, 11). No objections have been filed with the Court or submitted to Phoenix. (*Id* at ¶ 11). Class Members had the option of requesting to be excluded from the settlement through the website administered by Phoenix or by mailing a written request for exclusion to Phoenix. No requests for exclusion were received by Phoenix. (*Id.* at ¶ 10). Therefore, 100% of the 3,767 Class Members are participating in the settlement. (*Id.*).

/ / /

/ / /

/ / /

_____

mailing address; (3) last know telephone number; (4) last known email address; (5) social security number; (6) hire and termination dates; and (7) the total number of weeks during which the Class Member performed actual work during the Class Period. The Class Data was based on Blue Apron's payroll, personnel, and other business records. (Mara Decl., Exhibit 1 at ¶ 7).
[10] A search of this database provides updated addresses for any individual who has moved in the previous four (4) years and notified the U.S. Postal Service of their change of address. (Kruckenberg Decl. ¶ 4).
[11] The TLOxp search performs a "deep skiptrace" of a Class Member and has a greater chance of locating an accurate address for a Class Member.

## V.   DISCUSSION

### a.   The Settlement Meets the Standards Governing Final Approval

Matters that have been filed as class actions require court approval before a settlement can be consummated. *See* Fed. R. Civ. Proc. ("FRCP") 23(e). FRCP 23(e) provides that any compromise of a class action must receive Court approval. The Court has broad discretion to grant approval and should do so where the proposed settlement is "fair, adequate, reasonable, and not a product of collusion." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir. 1998); *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000). In determining whether a settlement should be approved, the Ninth Circuit has a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Heritage Bond Litigation*, 2005 U.S. Dist. LEXIS 13555, *9 (C.D. Cal. June 10, 2005) (*citing Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)).

Approval of a class action settlement involves a two-step process. In determining whether to grant final approval of the settlement, a court examines the terms for overall fairness and, in so doing, balances the following factors: the strength of the plaintiff's case; the risk, expense, complexity and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed; the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and, the reaction of the class members to the proposed settlement. *Hanlon*, 150 F.3d at 1026.

Here, the proposed settlement was reached only after undertaking a robust factual and legal investigation into the claims and defenses in this lawsuit. This robust factual and legal investigation led to Plaintiff filing his motion for class certification. It was only after Plaintiff filed his motion for class certification that the Parties reached an agreement to settle. The settlement amount takes into consideration the risks with regard to the Court granting certification of Plaintiff's claims, as well as difficulties associated with prevailing on the merits. In light of these risks, the settlement amount is well within the ballpark of reasonableness.

### i.   The Settlement was a Result of Arm's-Length Negotiations

The Ninth Circuit has shown longstanding support of settlements reached through arm's length negotiation by capable opponents. In *Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th

Cir. 2009), the Ninth Circuit expressly opined that courts should defer to the "private consensual decision of the [settling] parties." *Id.* at 965, citing *Hanlon*, 150 F.3d at 1027. "A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's length negotiations between experienced, capable counsel after meaningful discovery." *H&R Block Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 116 (2d Cir. 2005); *see also Kirkorian v. Borelli*, 695 F. Supp. 446, 451 (N.D. Cal. 1988) (opinion of experienced counsel is entitled to considerable weight); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979) (recommendations of plaintiffs' counsel should be given a presumption of reasonableness). The proposed settlement is the product of arm's-length negotiations facilitated by Mr. Rotman, one of the most respected mediators in wage and hour class actions.

### ii. *In re Bluetooth* Factors are not Present Here

In *Bluetooth,* the Ninth Circuit articulated additional factors that need to be considered, especially where a settlement has been reached prior to formal class certification. *In re Bluetooth Headset Products Liability Litigation* ("*Bluetooth*"), 654 F.3d 935, 946 (9th Cir. 2011). As such, settlement agreements reached prior to class certification must withstand a higher level of scrutiny for signs of collusion or other conflicts of interest than ordinarily are required under Rule 23(e). The three signs *Bluetooth* instructs trial courts to look for are:

1. When class counsel receives a disproportionate distribution of the settlement, or when the class receives no monetary distribution but counsel is amply rewarded;
2. When the parties negotiate a 'clear sailing' arrangement providing for the payment of attorney's fees separate and apart from class funds without objection by defendant;
3. When the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id* at 947. This settlement passes the *Bluetooth* test. The NSA is over two and a half times larger than the fees requested by Class Counsel, which is the accepted federal benchmark of 25% of the GSA. Additionally, any amount requested by Class Counsel and not awarded by the Court shall become part of the NSA and distributable to Participating Class Members. Accordingly, unlike the settlement agreement in *Bluetooth,* the instant settlement cannot be said to arouse suspicion of collusion.

/ / /

### iii. The Settlement is Fair

When evaluating the settlement terms for purposes of ruling on whether to finally approve it, the Court is to review the strength of a plaintiff's case, including "the probable outcome of a trial on the merits of liability and damages as to the claims, issues, or defenses of the class and individual class members." *Van Ba Ma v. Covidien Holding, Inc.*, 2014 U.S. Dist. LEXIS 76359, *6-7 (C.D. Cal. 2014) (*citing Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173 (9th Cir. 1977)). In ruling on final approval, the "fairness hearing is not to be turned into a trial or a rehearsal for trial on the merits." *Id.* (*quoting Officers for Justice v. Civil Serv. Comm'n of the City and Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982)).

There is no standard or benchmark for determining whether a settlement is fair. "Ultimately the district court's determination is nothing more than 'an amalgam of delicate balancing, gross approximations and rough justice.'" *Officers for Justice v. Civil Service Comm. of City and County of San Francisco*, 688 F. 2d 615, 625 (9th Cir. 1982). A court should weigh the benefits that the settlement will realize for the class against the uncertainty of litigation and the possibility that the class members would obtain no relief in the absence of a settlement. *See Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("...it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements."); *see also Hanlon*, 150 F.3d at 1026 (When considering the fairness of a proposed class settlement, courts consider the strength of a plaintiff's case against the risk, expense, complexity and likely duration of further litigation.).

### 1. All of Plaintiff's Claims Revolve Around Blue Apron's Security Procedure

Blue Apron's non-exempt employees are required to go through a security area when entering the work area. Blue Apron does not pay employees for this time. Based on these facts, Plaintiff alleges that Blue Apron fails to pay employees all wages owed because employees are not paid for the time they spend going through Blue Apron's security at the beginning of their shifts and when returning from unpaid meal periods.

At the Richmond fulfillment center there is only one employee entrance that all production associates go through. Blue Apron prohibits employees from bringing personal items into the

fulfillment center. Therefore, employees leave personal items in their car or in a locker provided by Blue Apron. Once employees are ready to enter the fulfillment center, they go to Blue Apron's security screening area. To enter the production area of the fulfillment center, all employees have to go through this security screening area. This area consists of metal detectors that all employees walk through. Employees are only wanded or examined by security personnel if the metal detectors are triggered. After going through the metal detector, employees proceed to the time clocks to clock in for work. Plaintiff argues that employees should be paid for this time.

Plaintiff also alleges that Blue Apron does not provide employees with full thirty-minute meal periods and full ten-minute rest periods. Blue Apron's break area is outside of the security screening area. Blue Apron prohibits employees from eating in the fulfillment center as it is a food processing facility. Plaintiff argues that this forces employees to use break time to go through security when they return from a meal or rest period, thereby depriving employees of full meal and rest periods.

### 2. Risks of Certification

While Plaintiff remains confident that certification would be granted, he recognizes that there is a risk that he may not get certified on all of his claims. Plaintiff's claims for unpaid wages are particularly subject to this risk. This is because the Court could determine there is a distinction between employer searches that occur pre-shift and those that occur post-shift. The recent California Supreme Court decision in *Frlekin v. Apple, Inc.*,[12] notes this distinction. In that opinion, the Supreme Court states, "at least with regard to cases involving *onsite* employer-controlled activities, the mandatory nature of an activity is not the only factor to consider. We conclude that courts may and should consider additional relevant factors—including, but not limited to, ***the location of the activity***[.]" *Frlekin v. Apple, Inc.*, 2020 Cal. LEXIS 547 *1, *30 (2020) (first emphasis in original, second emphasis added). In *Frlekin*, the bag searches occurred at the end of employees' shifts, rather than at the beginning like we have here.

In the class certification context, a majority of decisions involve the question of whether or not employees must be paid for the time they spend going through an employer's security procedures

---

[12] 2020 Cal. LEXIS 547 *1 (2020).

when leaving the employer's facility rather than entering the facility. Many district courts have found that certification is appropriate in such cases. *See Hamilton v. Wal-Mart Stores, Inc.*, Case No. Case No. ED CV 17-01415-AB (KKx), 2018 U.S. Dist. LEXIS 168235 *1 (C.D. Cal. Aug. 21, 2018) ("[W]hether the time spent walking from the time clock to the security line or passing through the security line is considered 'hours worked' is a common question that can and should be resolved as to all class members. To decide this issue, the trier of fact would need to determine whether the employees were subject to Wal-Mart's control while walking from the clock to the security line and during the security check process."); *Rodriquez v. Nike Retail Services*, Case No. :14-cv-01508-BLF, 2016 U.S. Dist. LEXIS 110961 *1 (N.D. Cal. Aug. 19, 2016) ("Commonality is satisfied here because there is a common question of whether Nike's employees should be compensated for off the clock time spent undergoing the mandatory inspection."); *Scott-George v. Pvh Corporation*, Case No. 2:13-cv-00441-TLN-DAD, 2015 U.S. Dist. LEXIS 157410 *14 (E.D. Cal. Nov. 19, 2015).

Plaintiff argues that the holdings in these cases lend support to Plaintiff's position and that the outcome of certification here would be no different in a case where the security search is at the entrance of the facility rather than the exit. Very few cases have addressed the issue of whether security procedures entering an employer's facility are compensable. One district court case, *Cervantez v. Celestica Corp.*,[13] tangentially addressed this issue. There, the plaintiffs were seeking certification of the time employees spent going through security at the beginning and at the end of shifts. With regard to the pre-shift time, the district court noted that "Plaintiffs here are not required to appear at the security line at a specific time. Thus, the pre-shift security line requirement in this case may be more akin to time spent in an ordinary commute, where employees may choose to start earlier or later depending on their own judgment." *Cervantez v. Celestica Corp.*, Case No. 07-cv-729, 253 F.R.D. 562, 571 (E.D. Cal. July 30, 2008). The Court further noted that "[u]nlike the time Plaintiffs spend in the security line before their shifts, they have no choice about when to arrive at the security line at the end of the shift. Like the plaintiffs in *Morillion*, Plaintiffs are under the control of their employers while in the security line at the end of the shift: they cannot choose to leave the

---

[13] Case No. 07-cv-729, 253 F.R.D. 562 (E.D. Cal. July 30, 2008).

premises without going through the line, nor can they choose to run a personal errand before going through the line." *Id.* at 571-572. Because the class definition was drafted to include both the time pre-shift and post-shift time employees spent going through the employer's security procedures, the court found that it "need not decide whether Plaintiffs' pre-shift time is compensable, because, as explained below, there is a common issue of law as to whether the post-shift security line time is compensable." *Id.* at 571. Accordingly, there is a risk that the Court will find that Plaintiff's unpaid wage claims which are based upon the pre-shift security procedures should not be certified.

There is also a risk that should the Court grant certification of these claims, these claims would later be decertified. For example, in the case *Hamilton v. Wal-Mart Stores, Inc.* the district court granted certification of the unpaid wages claims based on employees going through a security checkpoint, only to later decertify them on the basis that the plaintiff was unable to set forth a workable damages model. *Hamilton*, Case No. Case No. ED CV 17-01415-AB (KKx), 2019 U.S. Dist. LEXIS 153367 *1, *41 (C.D. Cal. March 4, 2019) ("[T]he Court finds that Plaintiffs' security checkpoint subclass and Plaintiffs' overtime subclass to the extent it is based on the security checkpoint claim cannot be maintained because Plaintiffs are unable to put forth a workable damages model."). As such, there is also a risk that if Plaintiff's unpaid wages claim is certified, there is a risk that this class may later be decertified.

### 3. Risks on the Merits

#### a. Unpaid Wage Claims

Plaintiff's unpaid wages claims also face risks on the merits. As noted above, Plaintiff's unpaid wages claims are based upon Blue Apron's failure to pay employees for the time spent going through the security screening area. Employees must be paid for all "hours worked," as that phrase is defined in the Wage Order and interpreted by California courts. Hours worked is defined in Wage Order 8-2001[14] as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." Wage Order 8-2001, Subd. 2(G); *see also Mendiola v. CPS Security Solutions, Inc.*, 60 Cal. 4th

---

[14] This is the Wage Order that governs the production associates in this case.

833 (2015). Under this standard, "it is only necessary that the worker be subject to the control of the employer in order to be entitled to compensation." *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 584 (2000). The *Morillion* Court reasoned that an employee is under the employer's control and entitled to compensation when the employer "'directs, commands or restrains' an employee." *Morillion,* 22 Cal. 4th at 583 (*quoting Bono Enterprises, Inc. v. Bradshaw*, 32 Cal. App. 4th 968, 975 (1995)). The California Supreme Court further found that "[a]n employer that requires its employees to work minutes off the clock on a regular basis or as a regular feature of the job may not evade the obligation to compensate the employee for that time by invoking the de minimis doctrine." *Troester v. Starbucks Corp.*, 5 Cal. 5th 829, 847 (2018).

Blue Apron denies that this time is compensable. Blue Apron relies on the factors set forth in the recent California Supreme Court case, *Frlekin v. Apple, Inc.*, to show that the time employees spend going through the security area is not compensable. In *Frlekin*, the Supreme Court found that time Apple employees spend undergoing bag searches at the end of their shift is compensable. In coming to this conclusion, the Court states that court should consider the following factors in determining whether an employer has exerted compensable control over employees:

> We also emphasize that whether an activity is required remains probative in determining whether an employee is subject to the employer's control. But, at least with regard to cases involving *onsite* employer-controlled activities, the mandatory nature of an activity is not the only factor to consider. We conclude that courts may and should consider additional relevant factors—including, but not limited to, the location of the activity, the degree of the employer's control, whether the activity primarily benefits the employee or employer, and whether the activity is enforced through disciplinary measures—when evaluating such employer-controlled conduct.

*Frlekin*, 2020 Cal. LEXIS 547 at *30 (emphasis in original).

The degree of an employer's control is one of the relevant factors a court should consider. Blue Apron argues that the security procedures it requires employees to undergo are much different than the bag searches in *Frlekin* and similar cases. Blue Apron requires employees to leave personal belongings in their car or locker and then walk through metal detectors. Blue Apron does not search inside employees' bags. If an employer sets off the metal detector, they may be wanded by security personnel, but do not have to undergo any further security screening. This is in contrast to the Apple

employees in *Frlekin*. In *Frlekin*, Apple controls employees during the security procedure in several ways:

> First, Apple requires its employees to comply with the bag-search policy under threat of discipline, up to and including termination. Second, Apple confines its employees to the premises as they wait for and undergo an exit search. Third, Apple compels its employees to perform specific and supervised tasks while awaiting and during the search. This includes locating a manager or security guard and waiting for that person to become available, unzipping and opening all bags and packages, moving around items within a bag or package, removing any personal Apple technology devices for inspection, and providing a personal technology card for device verification.

*Frlekin*, 2020 Cal. LEXIS 547 at *10-*11. The *Frlekin* Court notes that the level of control an employer has over its employees is a "determinative" factor. *Id.* at *10. Blue Apron asserts that the level of control it exerts on employees is far lower than the control asserted by Apple. Blue Apron contends that because this factor is not met, the time employees spend going through the security area is not compensable. There is a risk that the Court will agree with Blue Apron find the time Blue Apron employees spend going through the security area is not compensable.

Another relevant factor for courts to consider is whether the employee's activity primarily benefits the employer. *Frlekin*, 2020 Cal. LEXIS 547 at *21. In *Frlekin*, "the employer-controlled activity primarily serves the employer's interests. The exit searches are imposed mainly for Apple's benefit by serving to detect and deter theft. In fact, they are an integral part of Apple's internal theft policy and action plan." *Id.*at *22. Blue Apron argues that this factor also cuts against the Plaintiff's claim that the time employees spend going through the security area is compensable. Blue Apron's security area is at the entrance of the facility for the safety and protection of employees. Blue Apron screens employees to ensure they are not bringing in dangerous items such as weapons that can be used to harm other employees. Unlike in *Frlekin*, where the searches were done for Apple's benefit, the security searches here are done primarily for the benefit of employees. Blue Apron contends that this further shows that the time employees spend going through the security area is not compensable time.

For these reasons, there is a risk that the Court could agree with Blue Apron's arguments and find in Blue Apron's favor on the merits of Plaintiff's unpaid wages claims.

/ / /

### b. Meal and Rest Period Claims

Plaintiff's meal and rest period claims face risks on the merits. Plaintiff contends that Blue Apron does not provide employees with full thirty (30) minute meal periods and ten (10) minutes rest periods. Employers have an obligation under California law to provide employees with thirty (30) minute rest periods. Under California Labor Code § 512(a), "[a]n employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of ***not less than 30 minutes*** . . . ." Cal. Lab. Code § 512(a) (emphasis added). When an employer fails to comply with the requirements of California Labor Code § 512(a), "the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal period . . . is not provided." Cal. Lab. Code § 226.7.

In addition, employers have an obligation to provide employees with ten (10) minute rest periods. An employer's obligation to provide its employees with rest periods arises under the IWC Wage Orders. Wage Order 8-2001, Section 12(A) requires, "[e]very employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes ***net*** rest time per four (4) hours or major fraction thereof…" (emphasis added). California Labor Code § 226.7 prohibits employers from requiring "an employee to work during a meal or rest or recovery period mandated pursuant to an applicable statute, or applicable regulation, standard, or order of the Industrial Welfare Commission…" Cal. Lab. Code § 226.7(b). Failure to do so shall result in the employer paying "the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the meal or rest or recover period is not provided." Cal. Lab. Code § 226.7(c).

Here, Plaintiff argues that Blue Apron only provides employees with thirty (30) minutes for meal periods and ten (10) minutes for rest periods. Plaintiff argues that, in only permitting ten (10) minutes for rest periods and thirty (30) minutes for meal periods, employees are not being provided a full ten (10) minute rest period and thirty (30) minute meal period free of the employer's control. This is because, as Plaintiff's claim, part of break time necessarily includes coming back from the break room – which is outside the fulfillment center – and going through security. Thus, with only

having ten (10) and thirty (30) minutes for rest and meal periods, respectively, employees necessarily receive *less* than the allotted break time, because part of the time must be used going through the security screening.

Blue Apron argues and relies on evidence showing that, while employees are provided with thirty (30) minute meal periods and ten (10) minute rest periods, they also receive a five (5) minute "grace period" with each of these breaks. Blue Apron argues that this grace period is provided to allow employees to take a full thirty (30) minute meal period and ten (10) minute rest period at a suitable rest area. Blue Apron contends it has obtained numerous declarations from Class Members which show that, pursuant to the "grace period" policy, employees receive full thirty (30) minute meal periods and ten (10) minute rests periods at the break area. Thus, the dispute centers over whether Blue Apron's "grace period" policy provides for enough meal and rest period time as required under California law.[15] Another risk to losing on the merits is, should the Court find the security searches not to be compensable control, it could find the searches cannot constitute an unlawful control for purposes of meal and rest periods, which would defeat the claims.

For these reasons, Plaintiff's meal and rest period claims are also subject to risks on the merits.

### c. Wage Statement and Waiting Time Penalties Claims

Plaintiff also pursued claims for failure to provide accurate itemized wage statements and waiting time penalty claims. These claims are derivative of Plaintiff's unpaid wages claims. Should Plaintiff's unpaid wages claims fail, these claims would also fail. Blue Apron argues that it would not be liable for waiting time penalties because a "good faith dispute" exists over the payment of past wages. *See* Cal. Code Regs. Tit. 8 § 13520; *Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1201. Further, Blue Apron contends Plaintiff would have to prove it "willfully" failed to pay class members appropriate wages due upon separation of employment, which Blue Apron contends was not willful, as it was not adjudged to be the employee's employer at the time of separation. *See* Cal. Lab. Code § 203(a).

---

[15] Notably, a United States District Court recently found that a policy that provides for fifteen (15) minutes of rest time – like the Blue Apron's "grace period" policy here arguably provides – cannot be certified because individual issues predominate. *See Hamilton v. Wal-Mart Stores, Inc.*, Case No. 17-cv-01415, 2018 U.S. Dist. LEXIS 168235 *1, *38-*39 (C.D. Cal. Aug. 21, 2018).

### d. PAGA Claims

Plaintiff's PAGA claims are based on the same alleged unlawful conduct as their class claims. Therefore, PAGA penalties could only be awarded if the factfinder agreed with Plaintiff's theories of liability. Should the Court agree with any of Blue Apron's defenses to certification or on the merits, the potential exposure for PAGA would be reduced and any associated PAGA penalties would be extinguished, as penalties can only be awarded if the Court agrees with Plaintiff's underlying allegations. Further, these penalties would be duplicative of the recovery from the underlying violations.

Section 2699, subdivision (e)(2) provides that "[i]n any action by an aggrieved employee seeking recovery of a civil penalty available under subdivision (a) or (f), a court may award a lesser amount than the maximum penalty amount specified by this part if, based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary, oppressive, or confiscatory." In *Thurman v. Bayshore Transit Management, Inc.*,[16] the court determined that an award of the maximum penalty allowed may be unjust in circumstances outside of when a defendant cannot afford to pay the maximum amount. *Thurman v. Bayshore Transit Management, Inc.* (2012) 203 Cal. App. 4th 1112, 1135-1136. The *Thurman* court found that penalties may be reduced when a defendant has taken its obligations to comply with the law seriously. *Id.* Blue Apron argues that if the case were to continue in litigation, it would be able to show that it took its obligations to comply with the law seriously. This is further evidenced by Blue Apron's agreement, as part of the settlement, to modify its meal and rest period policies and install timeclocks outside of the security checkpoint. As such, if Plaintiff were able to prevail on the merits of his PAGA claims, it is likely that the Court would reduce the maximum penalty allowed.

### 4. Risks of Further Litigation

Plaintiff's claims also face risks in going forward with litigation. If litigation continues, there is a risk that Blue Apron could go out of business. If this occurs, employees would not receive any compensation for the wage and hour violations Plaintiff alleges against Blue Apron. As part of the

---

[16] 203 Cal. App. 4th 1112 (2012).

settlement, Blue Apron provided Plaintiff's financial expert with financial documents. (Declaration of Farshid Khosravi in Support of Plaintiff Terrance Bailey's Motion for Preliminary Approval of Class Action Settlement ("Khosravi Decl."), ECF Dkt. No. 38-5, ¶ 4). Plaintiff's expert has analyzed these documents and concluded that Blue Apron has been operating at a net loss since 2017. (*Id.* at ¶ 5). The fourth quarterly reports for 2019 show that Blue Apron lost over 200,000 customers from the prior year. (*Id.*).

Further, Blue Apron was nearly kicked off the New York Stock Exchange. In June 2019, Blue Apron's "stock was trading at just 55 cents last June and was in danger of being delisted from the New York Stock Exchange before a 1-15 reverse stock split boosted the stock price to $8.25." (Paul R. La Monica, "Blue Apron may be up for sale as losses mount," CNN Business, last accessed February 27, 2020, 10:00 a.m., https://www.cnn.com/2020/02/18/investing/blue-apron-earnings/index.html; *see also* Khosravi Decl. ¶ 6). "In a reverse split, a company reduces the number of total shares outstanding in order to raise the stock price. But the market value of the company remains the same." (*Id.*). Since the reverse split, "[s]hares have plunged more than 50% to below $4. The stock is now down a stunning 97% from the peak price it hit shortly after Blue Apron went public in June 2017." (*Id.*).

In addition, Blue Apron recently closed its fulfilment center in Arlington, Texas. (Khosravi Decl. ¶ 7; *see also* Maria Halkias, "Blue Apron is closing its Arlington meal-kit fulfillment center, cutting 240 jobs," The Dallas Morning News, last accessed February 27, 2020, 9:44 a.m., https://www.dallasnews.com/business/retail/2020/02/19/blue-apron-is-closing-its-arlington-meal-kit-fulfillment-center-cutting-240-jobs/).[17] This operation was downsized a year ago from 456 employees to about 240 employees. (*Id.*). "This decision comes as the company reported customer defections and another unprofitable quarter[.]" (*Id.*).

Should litigation continue, there is a risk that Blue Apron may no longer be in business, meaning even if Plaintiff were to prevail on the merits of his claims, Plaintiff and class members

---

[17] *See also* Chris Roberts, "How Blue Apron Became a Massive $2 Billion Disaster," Observer, last accessed February 27, 2020, 10:07 a.m., https://observer.com/2020/02/blue-apron-disaster-silicon-valley/.

1    would not be able enforce a judgment in their favor.

2           **b.  Sufficient Discovery and Investigation Has Occurred**

3           Class Counsel conducted a thorough investigation into the facts of this lawsuit. Throughout

4    the course of litigation, the Parties engaged in written discovery. The written discovery conducted

5    and the resultant meet and confer efforts led to the exchange of thousands of pages of documents.

6    These documents include, but are not limited to, employee handbooks, employee handbook training

7    documents, time records, attendance records, blueprints of Blue Apron's California locations, job

8    descriptions, documents outlining how employees clock in and out, associate reviews, discipline

9    records, attendance and punctuality policies, organizational charts, and wage statements. Blue Apron

10   also produced surveillance videos showing the security area and exit of its fulfillment center. Plaintiff

11   hired an expert, Mr. Brian Kriegler, who analyzed the timekeeping and payroll data and surveillance

12   videos produced. (Mara Decl. ¶ 12).

13          The Parties also conducted deposition discovery. Blue Apron took Plaintiff's deposition. In

14   addition, Plaintiff took the deposition of Defendants' Federal Rule of Civil Procedure 30(b)(6)

15   witness, Ms. Jolie Loeble. Ms. Loeble is Blue Apron's Vice President of Human Resources. During

16   the deposition of Ms. Loeble, Plaintiff became aware of Ms. Jacqueline Saunders. Ms. Saunders is

17   Blue Apron's security manager/supervisor in California. Plaintiff then took the deposition of Ms.

18   Saunders. (Mara Decl. ¶ 13).

19          After conducting an analysis of the materials Defendant produced, Class Counsel also drew

20   on their extensive experience in similar cases to assess the strengths and weaknesses of Plaintiff's

21   claims. This discovery allowed the Parties to assess the merits and value of Plaintiff's claims and

22   defenses thereto, if a settlement was not reached. Based on their review and independent investigation

23   into the facts and claims asserted in this matter, Class Counsel believe that this settlement is fair,

24   reasonable, and adequate and is in the best interest of the class. (Mara Decl. ¶ 15).

25          **c.  Class Counsel Have Extensive Experience Acting as Class Counsel**

26          As set forth in Plaintiff's Motion for Attorneys' Fees, Costs, and Class Representative

27   Enhancement Payment (ECF Dkt. No. 45), Class Counsel's experience in complex class action

28   matters is extensive. Indeed, Mr. Mara from the Mara Law Firm, PC was class counsel in *Hohnbaum*

*et al. v. Brinker Restaurant Corp et al.,* which is the subject case in the landmark decision of *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004. Class Counsel have prosecuted numerous cases on behalf of employees for California Labor Code violations and thus are experienced and qualified to evaluate the class claims present in this case, and the defenses thereto, and to evaluate settlement versus trial on a fully informed basis. This experience instructed Class Counsel on the risks and uncertainties of further litigation and guided their determination to endorse the proposed settlement.

> **d. The Class Members' Response to the Settlement is Further Evidence That the Settlement is Fair and Reasonable**

The Ninth Circuit has held that the number of class members who object to a proposed settlement is a factor to be considered in determining a settlement's fairness. *Mandujano v. Basic Vegetable Products, Inc.*, 541 F. 2d 832, 837 (9th Cir. 1976). Here, not a single Class Member has objected to the settlement or requested to be excluded from the settlement, resulting in a 100% participation rate in the settlement. The lack of objections and requests for exclusion evidences the Class Members' endorsement of this non-reversionary settlement.

> **e. The Court Should Approve the Settlement Administration Fee**

The Parties agreed to hire Phoenix as the Settlement Administrator, a choice the Court approved in conjunction with granting preliminary approval. Phoenix was responsible for mailing the Class Notice to Class Members, obtaining better addresses for undeliverable Class Notices, responding to Class Member inquiries, providing weekly status reports to all counsel, receiving communications from the Class Members, maintaining a settlement website through which Class Members could request to be excluded, and providing a declaration documenting its duties and responsibilities in administering the Class Notice. Following the grant of final approval, Phoenix will continue to calculate the payments to Participating Class Members, send the individual Settlement Shares to Participating Class Members, distribute other payments ordered by the Court, and perform such other duties as described in the Joint Stipulation. Phoenix's fee of $22,500 for services rendered and to be rendered is fair and reasonable and should be granted.

/ / /

/ / /

### f. The Court Should Approve the PAGA Payment to the LWDA

The payment of $112,500 (75% of $150,000) to the LWDA for its share of the applicable penalties claimed under PAGA, is reasonable under the circumstances. The Parties negotiated a good faith amount to the LWDA. The sum to be paid to the LWDA was not the result of self-interest at the expense of other Class Members. The LWDA was provided notice of the settlement concurrently with the filing of the preliminary approval motion and the instant motion. Plaintiff did not receive a response or objection to the settlement from the LWDA. (Mara Decl. ¶ 16). Thus, Plaintiff respectfully requests the Court finally approve the sum of $112,500 for payment to the LWDA.

## VI. CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that the Court find the settlement is fair, reasonable, and adequate and grant final approval of the settlement. Plaintiff further requests the Court approve the requested settlement administration fee and PAGA payment. Last, Plaintiff respectfully requests the Court enter final judgment in this matter.

Dated: October 15, 2020          **MARA LAW FIRM, PC**

  /s/ *David Mara*
  David Mara, Esq.
  Jill Vecchi, Esq.
  Attorneys for Plaintiff TERRANCE BAILEY